**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

PROPPER INTERNATIONAL SALES, INC., )
)
Plaintiff, )
)
vs. )
)
CRYE PRECISION LLC and LINEWEIGHT, )
LLC, )
)
Defendants. )

Case No. 4:26-cv-624

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff Propper International Sales, Inc. ("Propper") alleges as follows for its Complaint

against Defendant Crye Precision LLC and LineWeight, LLC (collectively "Defendants" or

"Crye"):

**Nature of the Action**

1.      This is an action for a declaratory judgment of non-infringement, unenforceability,

and invalidity of Defendants' U.S. Copyright Registration No. VA-1-942-951 arising under the

Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Copyright Act, 17 U.S.C. § 101,

*et seq.*; and for tortious interference, unfair competition, and injurious falsehood.

2.      Propper brings this action seeking the Court's assistance to put an end to

Defendants' ongoing unfair competition, misrepresentations, and tortious interference related to

Defendants' false claim of IP rights in a camouflage design developed, adopted, and owned by the

United States Government.  Propper also seeks preliminary and permanent injunctive relief—as

well as compensatory and punitive damages—to remedy the past and ongoing harm caused by

Defendants' malicious and baseless infringement allegations against Propper's customers.

**Parties**

3.      Plaintiff Propper International Sales, Inc., is a Delaware corporation located at 17 Research Park Dr., Suite 100 Saint Charles, MO 63304.

4.      On information and belief, Defendant Crye Precision LLC is a New York limited liability company located at 63 Flushing Ave. Unit 252, Building 128B, Brooklyn, NY 11205.

5.      On information and belief, Defendant LineWeight, LLC, is a New York limited liability company located at 63 Flushing Ave. Unit 252, Building 128B, Brooklyn, NY 11205

**Jurisdiction and Venue**

6.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C §§ 1331, 1338(a), 1331(b), 1367, 2201, and 2201.

7.      This Court has personal jurisdiction over Defendants in this case.  This cause of action arises out of acts or omissions committed by Defendants in the State of Missouri. Specifically, Defendants have contacts with the State of Missouri, have individually and/or through one or more duly authorized agents, conducted and transacted business within this state (including related to enforcement of the purported intellectual property rights at issue in this case), and Defendant Crye has committed tortious acts within this state.  Further, Defendants have previously consented to jurisdiction in this Court in bringing the lawsuit captioned *Lineweight LLC et al v. First Spear, LLC*, No. 4:18-cv-00387 (E.D.Mo.), filed March 8, 2018, related to their intellectual property rights.

8.      Venue is proper under 28 U.S.C. § 1391(b) because Defendants are subject to personal jurisdiction here and a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this District.  Specifically, Defendant Crye sent certified mail and other correspondence directed to Plaintiff at Plaintiff's business address in Saint Charles, Missouri,

2

relating to Defendants' enforcement of their alleged intellectual property rights at issue in this case. Further, the ongoing harm resulting from Defendants' actions has occurred in this District.

### Factual Background

**A.    Propper's Business**

9.    Propper and its affiliates have a long history as a trusted manufacturer of high-quality military, law enforcement, and tactical apparel. Propper has earned the trust of its customers, including the U.S. Government, as evidenced by the multiple supplier awards that Propper has received from the Department of Defense over the years. Propper and its affiliates have facilities in Missouri, Tennessee, Puerto Rico, and Haiti. Propper has developed significant goodwill over the years with its customers by manufacturing high-quality and dependable products and staying true to its vision: *Dedicated to equipping those who commit their lives to serving others*.

10.    Among the products that Propper manufactures and sells are camouflaged apparel and equipment made using the U.S. Government's Operational Camouflage Pattern ("OCP"). Propper obtains the fabric with the OCP pattern from fabric suppliers who are licensed to provide these patterns for certain commercial purposes from the U.S. Government.

**B.    History of Crye's and the United States' Relevant Camouflage Development**

11.    From 2002 through 2004, the U.S. Army ran a four-phase study to find a new and more effective camouflage pattern to replace the previously-used BDU Woodland Camouflage and DCU Desert Camouflage uniforms.

12.    Beginning with Phases 1 and 2 in 2002 the U.S. Army Natick Soldier Center ("Army Natick") developed three patterns in four color combinations based on different terrain: woodland, desert, urban, and desert/urban. After extensive testing, certain of these patterns and

3

color combinations were eliminated as potential camouflage solutions, while other patterns and color combinations moved on for further consideration in Phase 3.

13.    In 2004, the Army Natick and Crye Precision jointly developed a camouflage pattern that was introduced into testing and later referred to as "Scorpion."  On information and belief, LineWeight was awarded a design patent, U.S. Patent No. D487,848, disclosing the Scorpion pattern.  This patent expired in 2018.

14.    Though the Scorpion pattern received higher ratings in woodland environments than Desert Brush, Woodland Track, and Urban Track, it was rated low in Desert and Urban environments.  At the end of the Army's study, Desert Brush was announced the winning camouflage pattern, though neither Desert Brush, nor the remaining three camouflage patterns were ultimately put into use.

15.    Instead, the Army announced it was opting for a pattern not tested during the 2002 through 2004 studies, the "Universal Camouflage Pattern (UCP)."

16.    In 2005, the UCP pattern officially replaced the Battle Dress Uniform and Desert Camouflage Uniform.

17.    By 2009, the Army had received significant negative feedback concerning the suitability and use of UCP in Afghanistan.  As a result, the Army submitted a Report to Congress on Combat Uniform Camouflage with another four-phased approach to a camouflage solution.

18.    Meanwhile, after the 2004 joint Army Natick and Crye development of Scorpion, Crye had altered the Scorpion pattern to be licensed by Crye under the name MultiCam®, which was then made available to the public.

19.    In November 2009, Phase II saw two different camouflage patterns face-off: MultiCam® and UCP-D (a variant of UCP).

4

20.     By February 2010, the Army kicked off Phase III by licensing Crye Precision for new MultiCam® uniforms under the name "Operation Enduring Freedom Camouflage Pattern (OEF-CP)."

21.     The adoption of the OEF-CP pattern was only a temporary fix to supply a viable camouflage pattern to Army troops in Afghanistan.  Because of special funding appropriated for operations in Afghanistan, OEF-CP could not be a blanket solution to U.S. Army troops globally due to affordability concerns.

22.     In late 2010, Phase IV was outlined as an 18-month-long competitive effort to identify a new camouflage solution.

23.     Phase IV consisted of 22 initial submissions, but by the second stage of Phase IV was narrowed down to four outside vendors:  Kryptek, ADS Inc., Brookwood, and Crye Precision.

**C.     Crye's MultiCam® Camouflage**

24.     Crye has touted the functional features of its MultiCam® camouflage as "having done the most to safeguard our troops."  Crye has also touted that "MultiCam® is one of the most thoroughly-tested camouflage patterns in existence.… It has been the top performer in every major Army camouflage test of the past decade and has been verified time and time again to provide a significant and undeniable Soldier survivability advantage."

25.     In its brochures, Crye alleges that:

MultiCam® patterns take advantage of the way the human eye and brain perceive shape, volume, and color.  Since only a very small portion of the human eye perceives color, the brain does a lot of "filling-in" for the eye.  The unique high resolution design of MultiCam® takes advantage of this principle and helps the observer to "see" the pattern as part of the background.

The MultiCam® family of patterns rely more on a blending effect than a traditional contrast effect to disguise the wearer.  This effect allows them to perform well in a wide range of environmental conditions.  It also helps maintain the patterns' effectiveness even at close ranges where low resolution patterns often stand out

against the natural (non-pixelated) environment.

26.    Crye maintains that its original MultiCam® pattern "was developed to effectively limit the visual and near-IR signature of a person operating across a very wide range of physical environments and seasons."  Additionally, Crye states that all of this is accomplished "with a minimal logistical burden.  The patterns have distinct roles but are designed to work together as a system to meet the needs of nearly any operating environment, all while helping the wearer to do so with the least amount of kit possible."

27.    On information and belief, the MultiCam® pattern was made public in late 2005, and was disclosed and claimed in U.S. Design Patent No. D592,861.

28.    U.S. Design Patent No. D592,861 expired on May 26, 2023.

29.    On information and belief, from 2008 through April 2014, Crye licensed several U.S.-based printers as non-exclusive licensees to print and sell products using the MultiCam® pattern in fulfillment of contracts issued by the United States Department of Defense, and for commercial sales.

30.    On information and belief, the licensed U.S.-based printers began producing MultiCam® fabric in fulfillment of contracts issued by the United States Department of Defense began around February 2010.  Further, while the Army was not privy to the specifics of the licensing agreements, the Army paid approximately a 10% premium on each uniform or piece of camouflaged equipment that was camouflaged with OEF-CP as compared to the same with UCP.

31.    On information and belief, because the focus in or around February 2010 was on an immediate solution for operations in Afghanistan, and because those operations benefited from additional funding, the 10% licensing premiums were less of a concern as compared with supplying U.S. troops globally.

32. After the extensive Stage II, Phase IV testing of the submissions by Crye, ADS, Brookwood, and Kryptek, the Army approved Crye's transitional pattern in May 2013 .

33. Faced with unknowns of potentially new statutory restrictions in pending legislation, the Army sought government purpose rights to OEF-CP/MultiCam® and to delay any remaining Phase IV decisions until the legislation was final.

34. On information and belief, Crye led the Army to believe that the price for OEF-CP/MultiCam® would be similar to the price offered to the Army for the transitional pattern non-exclusive license rights in the Phase IV contract (i.e., $600,000 for the set of patterns ($200,000 each for three patterns—woodland, desert, and transitional/OCIE)).

35. By late 2013, however, negotiations between Crye and the Army broke down over licensing fees.

36. On information and belief, in October 2013, Crye refused the contract terms proposed by the Army for OEF-CP, terms that were identical to the Phase IV contract option terms.

37. On information and belief, Crye sought a much higher licensing fee, akin to the 10% premium paid for OEF-CP back in 2010. Ten percent licensing fees equated to $3.9 million per month. Though Crye claimed they could reduce the fees to 1%, Crye had previously told the Army that they had no control over the 10% premium as a result of the printers licensing agreements.

38. Crye has acknowledged that the cost to the Army would have been "in the tens of millions of dollars." A news article published on March 11, 2014, quoted an Army source indicating that the Army did not want to pay Crye $24.8 million to use MultiCam®. The Army rejected Crye's offer.

**D.      The United States' OCP Camouflage**

39.      In or around the 2010 Phase IV considerations, the Government was considering another camouflage pattern created by Army Natick called Scorpion W2.

40.      Scorpion W2, like Crye's MultiCam®, had been developed, changed, and optimized independently from the base Scorpion pattern previously developed jointly by Army Natick and Crye back in the early 2000s.  Ultimately, the Army did not move forward with testing Scorpion W2 in the Stage II, Phase IV testing because the family of patterns was not of consistent matching geometric shapes, an established Army criteria and requirement of the four outside commercial vendor contracts.

41.      However, faced with further limitations arising out of the 2014 Defense Authorization Act and failed negotiations with Crye, the Army went back to considering Army Natick's Scorpion W2 pattern, which would officially become known as "Operational Camouflage Pattern (OCP)."

42.      The Government refers to Scorpion W2 as Operational Camouflage Pattern or "OCP."

43.      On July 31, 2014, the U.S. Army announced the new OCP uniforms would start becoming available to deployed troops immediately, and to all others on July 7, 2015.

44.      The Government filed utility patent applications related to OCP, including U.S. Patent Application No. 14,569,317.

45.      In the '317 Application, the Government identified the following members of its team at the U.S. Army Natick Soldier Research, Development and Engineering Center (later renamed U.S. Army DEVCOM Soldier Center) as the inventors of OCP:  Scotlund McIntosh, Lisa Bareiss Hepfinger, Cheryl Ann Stewardson, Anabela Dugas, and James George Fairneny.

8

46.     The Government was awarded U.S. Patent No. 9,062,938 ("the '938 patent") on June 23, 2015 for the invention of OCP by its named inventors.

47.     The Government owns the '938 patent.

48.     The '938 patent specification explicitly refers to Crye's U.S. Design Patent No. D487,848, which covered Army Natick and Crye's joint "Scorpion" pattern ("the '848 patent"). '938 Patent, at 3:3-4. The '938 patent explains that "the colors in the '848 patent tend to be light and muted, causing them to be of low contrast relative to each other. Also, the blotch sizes of the camouflage pattern of the '848 patent, such as, for example, the cream and dark brown blotches, are small in size and area. These factors can contribute to a pattern being perceived by an observer as merged together at distances that are shorter than desired." *Id.* at 3:5-11. *See also* '938 Patent, at 3:12-4:13 (discussing other disadvantages of the design embodied in the '848 patent).

49.     The '938 patent specification also explicitly refers to Crye's '861 design patent covering MultiCam®. *Id.* at 4:14-16. Crye's '861 design patent for MultiCam® is distinguished as having "vertically oriental line elements …, also referred to as vertical twig and branch elements, [which] are elongated and thin." *Id.* at 4:29-31. These vertical twig and branch elements are criticized in the '938 patent because the effectiveness of such "in transitional elements can be compromised due to signature cues in the vertical direction, meaning that the elongated thin vertical line elements in the camouflage pattern will stand out or be readily perceived." *Id.* at 4:33-38. Other critiques of Crye's MultiCam® pattern are disclosed in the '938 patent. *See generally*, *id.* at 4:14-5:9, 5:31-33.

50.     The OCP invention improves upon the original Scorpion, MultiCam®, and other prior art designs by providing a 7-color layer transitional camouflage pattern that increases the amount of brown in the pattern, changes the overlay of the screens in the brown region, increases

the sizes of blotches in certain color channels, as well as changes the colors of certain color channels in the pattern, has very few short thin line elements, and has no long thin vertically oriented line elements. *See, e.g., id.* at 11:18-30, 12:24-27.

51. The differences between OCP and MultiCam® and other prior art described in the OCP patents are recognized by individuals who purchase and wear camouflage.

52. The Government also owns the following patents relating to the OCP invention: U.S. Patent No. 9,074,849 ("the '849 patent"), U.S. Patent No. 9,631,900 ("the '900 patent"), and U.S. Patent No. 9,746,288 ("the '288 patent).

53. The '900 and '288 patents were each filed in May 2015 and granted over Crye's '861 design patent, which was specifically identified as prior art. *See* Patent No. 9,631,900 (filed May 26, 2015); U.S. Patent No. 9,746,288 (filed May 20, 2015).

54. OCP is a work of the United States Government under 17 U.S.C. § 101.

55. Since its first publication, OCP was—and continues to be—in the public domain for purposes of U.S. Copyright law under 17 U.S.C. § 105.

56. The U.S. Government licenses its intellectual property rights in OCP to a number of companies that produce fabric having the OCP camouflage pattern for use in creating garments and other items for sale to the Government and/or certain commercial sales.

57. These licensees include Propper's fabric suppliers, Navajo Air, LLC (d/b/a Navajo Fabrics) and Brittany Global Technologies Corp.

**E.      Crye's History of Aggressively and Improperly Alleging IP Rights in the Government's OCP Camouflage Pattern**

58. On information and belief, after Crye believed that the Government would be moving away from MultiCam® and adopting OCP, Crye devised a strategy to maintain its lucrative licensing revenue by claiming that it owned intellectual property rights in the

10

Government's OCP camouflage pattern.

59.     In January 2014, LineWeight, LLC, filed an application to register the MultiCam® camouflage pattern as a trademark with the U.S. Patent and Trademark Office ("USPTO"), including, for example, Application Serial Number 86/161631 ("the '631 trademark application").

60.     The U.S. Government (Department of the Army) filed a letter of protest against the '631 trademark application, noting that the MultiCam® camouflage design was functional under 15 U.S.C. § 1052(e)(5).  On August 12, 2014, the USPTO refused the '631 trademark application for being a functional design.  The USPTO provided evidence showing the utilitarian advantages of the camouflage design.  Despite LineWeight's multiple attempts to overcome the refusal, the USPTO maintained the position that the MultiCam® pattern was functional.  LineWeight abandoned the '631 trademark application.

61.     In addition to the '631 trademark application, LineWeight and/or Crye filed the following trademark applications attempting to register their camouflage patterns:  86/161503, 86/161550, 86/160311, 86/160412, 86/161594, 86/160445, 86/161357, 86/161381, and 86/161402.  Like the '631 trademark application, all of these trademark applications were also refused registration for being functional.

62.     After the USPTO rejected Crye's attempt to register its functional camouflage design as a trademark, Crye filed an application with the United States Copyright Office to register its camouflage design.

63.     On February 18, 2015, the United States Copyright Office registered Cyre's MultiCam® design.  This registration (VA-1-942-951) identifies Caleb Crye as the "author" and December 31, 2005, as the date of first publication.

64.     The VA-1-942-951 Copyright Registration covers Crye's MultiCam® pattern:



65.     This pattern identified in the VA-1-942-951 Copyright Registration is the same MultiCam® pattern that was covered by Crye's U.S. Design Patent No. D592,861, which expired on May 26, 2023.

66.     This pattern identified in the VA-1-942-951 Copyright Registration is the same functional MultiCam® pattern that Crye unsuccessfully attempted to register as a trademark.

67.     On information and belief, LineWeight owns the intellectual property rights associated with MultiCam®, including the VA-1-942-951 Copyright Registration.

68.     On information and belief, Crye has an exclusive license from LineWeight to the intellectual property rights associated with MultiCam®, including the VA-1-942-951 Copyright Registration.

69.     Defendants do not have a copyright registration for the Government's OCP camouflage pattern.

70.     In 2015, Crye was involved in ongoing litigation with one of its former licensees, Duro Textiles, LLC, including in a case styled *Crye Precision, LLC and Lineweight LLC v. Duro Textiles, LLC*, 15-cv-1681-DLC (SDNY) ("*Duro* Lawsuit").

71.     In the *Duro* Lawsuit, Crye alleged, *inter alia*, that Duro infringed Crye's intellectual

property rights by making and selling OCP fabric.

72.     In early 2015, Crye also sent letters to Duro's customers—including Propper—who purchased OCP fabric from Duro, alleging that the "Operational Camouflage Pattern is covered and protected by Crye's and LineWeight's Intellectual Property, and any person or company wishing to utilize the pattern is required to (i) receive authorization from Crye; and (ii) pay Crye licensing fee(s) for the same."

73.     A copy of February 27, 2015 letter to Propper, which was filed by Duro with its counterclaims in the *Duro* Lawsuit is attached as Exhibit A.  Nearly identical letters were sent to Duro customers American Apparel, Inc. and Blind Industries and Services of Maryland in early 2015.

74.     The intellectual property rights that Crye identified as covering OCP in its February 27, 2015 letter to Propper were listed in an exhibit to the letter and included the VA-1-942-951 Copyright Registration that Crye had received just nine days before, on February 18, 2015:

**Exhibit A**
**Intellectual Property**

US Patents: D,487,848; D592,861; D560,915 and D572,909

US Copyright Office Registration Numbers: VA-1-942-951; VA-1-205-145; and VA-1-192-640.

US Copyright Office Application Numbers: 1-1130883822; 1-1130883869; 1-1130883945; 1-1130883991; 1-1130904301; 1-1130904357; 1-1130778235 and 1-1130778235

US Design Trademarks: 85/902531; 86/161754; 86/161503; 86/161550; 86/161774; 86/161787; 86/161800; 86/161810; 86/161503; 86/160311; 86/160412; 86/161594; 86/161631; 86/160445; 86/161357; 86/161381 and 86/161402

75.     In its February 27, 2015 letter, Crye demanded that "Propper immediately (i) cease the use and sale of any and all Operational Camouflage Pattern fabric purchased from or received by either of Bennettsville Printing or Duro Textiles LLC; (ii) abstain from purchasing (and, if necessary, cancel any outstanding orders for) any additional Operational Camouflage Patter fabric from these printers; and (iii) contact Crye directly to obtain the names of printers who are

authorized to print Operational Camouflage Pattern fabrics." Crye requested a response "within five (5) days."

76.     The list of "US Design Trademarks" identified in Crye's February 27, 2015 letter to Propper included the serial numbers of the trademark applications for the camouflage designs that had already been refused by the USPTO because the camouflage design was functional.

77.     The court in the *Duro* Lawsuit granted summary judgment against Crye on April 22, 2016, and the United States Court of Appeals for the Second Circuit later affirmed this judgment.

78.     Around this same time, Crye was threatening other fabric suppliers of infringing its intellectual property rights by selling fabrics bearing the Government's OCP camouflage pattern. One such fabric supplier, Navajo Air, LLC filed a declaratory lawsuit on December 22, 2016, in a case styled *Navajo Air, LLC v. Crye Precision LLC and Lineweight LLC,* 16-cv-9873-CM (SDNY) ("*Navajo* Lawsuit").

79.     In the *Navajo* Lawsuit, Chief Judge Colleen McMahon granted summary judgment against Crye. A copy of the Summary Judgment Order in the *Navajo* Lawsuit is attached as Exhibit B. In granting summary judgment, the court concluded that, contrary to Crye's representations "that it owned intellectual property right in OCP," in reality "Crye does not own OCP – the USG [United States Government] does, at least insofar as the United States Patent and Trademark Office and the United States Army are concerned." Ex. B at 4.

80.     The court in the *Navajo* Lawsuit rejected Cyre's attempt to dispute these facts as "frivolous," and concluded that "Crye offers no evidence to support its contention that it has any rights in the [OCP] pattern." Exhibit B at 5. The court expressly held that "Crye does not have a protectable [IP] interest in OCP." *Id*. at 15 ("Where OCP is concerned, it has nothing to protect.").

14

On this basis, the court concluded that a restrictive covenant in an expired license agreement—which would have prohibited post-termination sales of OCP—was "contrary to public policy, in that its enforcement would allow Crye to restrict competition without having any legitimate business interest in OCP." *Id*. at 16.

81.     Finally, the court in the *Navajo* Lawsuit rejected Crye's "desperate attempt to capitalize off OCP" by rejecting Crye's royalty demand for fabrics using OCP: "Crye had nothing to give Santee [Navajo's fabric printer and former licensee of Crye] in exchange for a royalty, because the USG, not Crye, owns the intellectual property in OCP. Defendants are not entitled to collect royalties in exchange for nothing." *Id*. at 18.

82.     Following the court's summary judgment order in the *Navajo* Lawsuit, the parties reached a settlement agreement and dismissed the case with prejudice in 2018.

83.     Propper has been openly manufacturing, marketing, and selling OCP products commercially since at least 2019.

**F.     Crye's Recent and Ongoing Improper Threats against Propper and Propper's Customers**

84.     On August 19, 2025—approximately eight years after Defendants dismissed the *Navajo* Lawsuit, Crye again starting sending threatening communications to Propper, alleging that it "is the exclusive licensor of all intellectual property associated with the MultiCam® family of camouflage patterns [and that these] rights extend to the OCP pattern. . . ."

85.     On September 19, 2025, Crye sent a letter by certified mail to Propper and threatened "to escalate this matter through the appropriate legal channels."

86.     On November 20, 2025, Crye had its litigation counsel, Greenberg Traurig, send a letter to Propper, indicating that Crye had "referred the matter to this firm for further action." In this letter, Crye asserted that the Scorpion W2 camouflage pattern (OCP) "is an unauthorized

derivative of the renowned MultiCam® camouflage pattern—a design which is controlled exclusively by Crye." Therefore, according to Crye, "if Propper now intends to commercialize Scorpion W2 in a way that could affect Crye's commercial MultiCam® business Crye will need to begin collecting royalties on such commercial sales." Crye demanded that Propper "either (i) immediately cease-and-desist from further commercial sales of products using the Scorpion W2 design; or (ii) as a preferable option . . . confirm a willingness to explore an appropriate per-item royalty arrangement." Crye's litigation counsel ended the letter by noting that "[i]n the event we do not receive a satisfactory response in a timely manner, we have been authorized to take all steps necessary to protect our client's rights, including via litigation."

87. Propper timely responded to Crye's letter on December 4, 2025, refusing Crye's demand to pay royalties on products made with the OCP pattern under license from the Government. Propper noted that "it is our understanding that the U.S. Government holds all associated intellectual-property rights, including patent rights, to the OCP patterns." Propper also requested Crye to identify "the specific statutory, regulatory, contractual, and intellectual-property authorities (including but not limited to copies of all applicable patents, copyrights and trademarks)" supporting Crye's belief that it owns "any enforceable intellectual-property rights in the OCP pattern." Propper also noted that it simply buys the OCP fabrics from the printers licensed by the Government and that "if Crye believes that it is owed anything for the sale of the fabrics so printed, its remedy lies with the printers."

88. Crye's litigation counsel responded on December 19, 2025, identifying U.S. Copyright Registration No. VA 1-942-951, and included a copy of this registration. In response to Propper's suggestion that Crye raise its concerns with the Government-licensed printers, Crye's counsel noted that "pursuing royalties directly from those printers would be "impracticable."

Crye's counsel again demanded that "Propper either (i) immediately cease and desist from further commercial sales of products incorporating the Scorpion W2 design, or (ii) confirm its willingness to engage in discussions regarding an appropriate per-item royalty arrangement." Crye demanded a response by January 2, 2026, and noted that if this deadline was missed, "Crye will promptly pursue escalatory action, including, without limitation, the commencement of litigation against Propper and its distributors based on their ongoing and willful infringement of Crye's MultiCam® intellectual property."

89.     Propper timely responded through outside counsel, reiterating its belief that Crye was not entitled to royalties on sales of products using the Government's OCP pattern. Propper's counsel also noted that when Propper sells products using the MultiCam® pattern, Propper purchases the fabric from Crye's licensed fabric printer, such that Crye receives royalties for that fabric.

90.     Crye's counsel responded on January 12, 2026, emphasizing that Propper had only two options: "(a) immediately cease and desist from further commercial sales of products incorporating the Scorpion W2 design; or (b) agree to pay a per-item licensing fee to Crye for future commercial sales of such products, pursuant to a license granted by Crye." Crye indicated that "[w]e do not intend to engage in further correspondence on these issues absent Propper's clear written election under paragraph (a) or (b) above."

91.     In that January 12, 2026 letter, Crye's counsel indicated that if Propper did not agree to these demands, it would implement the following strategy:

In addition, please note the following. First, absent Propper taking the necessary steps to resolve this matter, Crye will begin sending cease-and-desist letters to Propper's many resellers and distributors of Propper's infringing OCP products, a step Crye has deliberately refrained from taking to date as a courtesy to Propper. Second, Crye conducts business only with companies that operate with integrity and respect intellectual property rights. If Propper fails to accept one of the two reasonable resolutions outlined above, Crye will be compelled to conclude that Propper does not meet that standard and, as a result, will direct its licensed MultiCam® printers, as well as 1947 LLC, to permanently cease all sales of authentic MultiCam® fabrics and webbing to Propper and any of its known associates or manufacturers.

92.     This January 12, 2026 letter from Crye's counsel also instructed Propper to preserve documents because "Propper is now on notice of anticipated litigation."

93.     On the same day, January 12, 2026, Gregg Thompson, as the Executive Director and Owner of Crye Precision, sent an email to Propper's Chief Financial Officer, indicating that "we have no choice but to continue pursuing Propper on this matter." Mr. Thompson also noted that "[e]ach and every one of the other companies we have reached out to regarding this matter have chosen [to pay licensing fees on OCP]."

94.     Mr. Thompson alleged that the assertion that the Government owns all the IP rights in the OCP pattern is "simply wrong" and that he "watched this exact argument fail repeatedly over the years, at great expense to the companies persuaded to make it."

95.     If Propper refused to pay a royalty on OCP, Mr. Thompson threatened expensive litigation:

What concerns me most is where this path leads. If this continues, Crye will have no choice but to litigate aggressively. We will spend whatever it takes to win, even if that means millions in legal fees. You will end up spending comparable amounts. At the end of it, Crye will still own its IP, Propper will still lose, and the only guaranteed winners will be the lawyers. That's not a threat, it's just reality based on long experience.

96.     Mr. Thompson then threatened that Crye would also take additional actions to damage Propper's business, if Propper refused to cooperate:

18

You should also seriously consider the downstream consequences. As Justin MacLean mentioned to Ruth in our formal reply earlier today (a copy of the correspondence I'm attaching here for your reference), absent a quick turn of events, we will be cutting off Propper's ability to purchase MultiCam fabric. Propper permanently losing access to MultiCam would, in my view, be far more damaging to Propper's business than paying a few thousand dollars a year in licensing fees for commercial OCP sales. On top of that, once distributors and resellers start receiving cease-and-desist letters and litigation holds (another step that we have deliberately held off on until now, but will be taking in the near term absent near-immediate amicable resolution), that damage compounds very quickly.

97.    After some further back-and-forth, Mr. Thompson sent another email to Propper on January 29, 2026, again threatening to implement Crye's plan to damage Propper's business:

We remain hopeful that this can be resolved efficiently and without escalation. That said, if I do not hear back from you by Tuesday, February 3, we will proceed accordingly. Specifically, I will direct Justin Maclean (my outside counsel) to move forward as outlined in his January 12 correspondence, and, separately, our in-house team will begin notifying all authorized MultiCam® printers that Propper is no longer approved to purchase MultiCam® materials.

98.    On February 6, 2026, Crye directed each of its licensed MultiCam® fabric printers, including Propper's supplier, 1947 LLC, to cease all sales of MultiCam® fabrics and webbing to Propper and Propper's associates and manufacturers.

99.    Crye has since advised Propper that it intends that its actions will preclude Propper from procuring MultiCam® fabric from any of the licensed suppliers and threatened that any attempt by Propper to purchase licensed MultiCam® fabric would be met with aggressive legal action:

Propper is therefore advised that it currently has no lawful avenue to procure authentic MultiCam® fabric, directly or indirectly, from any licensed source. Any attempt to do so will expose Propper to liability for inducing breach of contract between Crye and its licensed printers. Furthermore, any MultiCam® fabric procured by Propper in circumvention of the above will be treated by Crye as counterfeit MultiCam®, and Crye will pursue all available remedies, including claims for counterfeiting and willful infringement, to the fullest extent of the law.

100.    On February 16, 2026, Crye's litigation counsel sent an email to Propper's counsel indicating that Crye would immediately begin sending letters to Propper's resellers and distributors, as part of Crye's strategy outlined in his January 12 letter.

101.    When Crye owns legitimate intellectual property rights, Propper has respected those rights.  For example, since August 2017, Propper has licensed Crye's patent rights relating to a specific type of combat shirt ("Combat Shirt License Agreement").  For nearly ten years, that

19

licensing relationship proceeded smoothly and Propper has paid substantial royalties to Crye under this license.

102.    On February 20, 2026, Crye notified Propper that it was demanding an audit under the Combat Shirt License Agreement and was considering whether it wanted to renew that agreement when it was set to expire in August of 2026.  On March 17, 2026, Crye notified Propper that it would not be renewing the Combat Shirt License Agreement.

103.    In late March, Crye began sending letters to Propper's customers.  In these letters, Crye asserted that "[a]ny use of OCP, whether for government or commercial purposes, implicates Crye's intellectual property rights in MultiCam®, including but not limited to Crye's U.S. copyright (Registration No. VA 1-942-951), and requires Crye's authorization."

104.    Crye's March 2026 letters to Propper's customers further asserted that Propper's sales of OCP products in the commercial marketplace "and each downstream act of advertising, offering for sale, and selling, including by resellers such as your company – constitute actionable infringement of Crye's intellectual property rights."  Crye further represented that "Propper has done little more than advance arguments that lack legal merit and will not succeed in Court," "has not meaningfully engaged with Crye's position," and that "Propper stands alone in their refusal to engage in good faith."

105.    Crye then blamed Propper for the fact that Crye had sent these legal threats to the customer:  "Propper has failed not only to address its own infringement, but has also failed to consider the legal exposure it has created for the resellers and distributors of its products – despite having been made expressly aware of that exposure.  Propper's failure to engage has left Crye with no alternative but to address the downstream distribution of these products directly with resellers and distributors . . . . This is not an outcome Crye sought.  We would have strongly preferred to

20

resolve this matter directly with Propper, and we regret that you have been placed in this position."

106. Crye's March 2026 letters to customers announced that it "is now in a position to commence a broad lawsuit against Propper and, as necessary, against the resellers and distributors participating in the commercial distribution of these products. . . ." Crye demanded that if Propper's customers wanted to avoid litigation, they must immediately stop selling and distributing Propper OCP products or pay a royalty:

> Crye is prepared to commit the resources required to resolve this matter in Court — both to defend and protect its MultiCam® intellectual property and to collect the licensing revenue to which it is entitled on commercial OCP sales. Crye further reserves the right, in its discretion, to seek injunctive relief preventing the continued unauthorized sale of such products. Accordingly, in order to avoid this outcome, we request that your company either:
>
> (1) immediately cease and desist from the sale and distribution of Propper OCP products in the commercial marketplace; or
>
> (2) confirm a willingness to enter into a license agreement with Crye, pursuant to which your company will pay an appropriate per-item royalty in return for the right to continue to sell those products.

107. Crye's March 2026 letters to Propper's customers gave them seven business days to respond and ended with a demand to institute litigation holds and preserve documents.

108. Cyre sent these letters to dozens of Propper's customers, including Kel-Lac Uniforms, Inc., R&S Army Navy Store; Mil-Bar Plastics, Inc; OpticsPlanet, Inc., Springs Tactical Gear, Inc. (d/b/a Venture Surplus), Commando Military Supply, Full Metal Jacket, LLC, and Bradley's Military Surplus.

109. In recent follow-up communications with Propper customers, Crye has expressly asked Propper's customers to refrain from placing new order for Proper OCP products.

110. On information and belief, Crye sent these communications with the intent to damage Propper's reputation and/or business interests in an effort to pressure Propper to agree to pay royalties on products using the Government's OCP.

21

111.   Crye's ongoing communications with Propper's customers have harmed and will continue to harm Propper's goodwill.

112.   Crye's letters have also resulted in direct pecuniary damages, as some customers have recently informed Propper that they have pulled all of Propper's OCP products from its store shelves and online stores and instructed Propper not to fill any backorders.

113.   On information and belief, this is precisely the type of "quickly compounding damages" that Mr. Thompson intended for Propper to suffer when Crye initiated its plan to threaten Propper's customers.

114.   Crye knew or should have known that it does not possess enforceable intellectual property rights, including the VA 1-942-951 Copyright Registration, that could preclude the use of the Government's OCP for any purpose.

115.   No reasonable litigant in Crye's position could realistically expect success on the merits of its copyright infringement allegations against Propper for using the Government's OCP.

116.   On information and belief, Crye knew that its infringement allegations against Propper and Propper's customers were baseless or acted with reckless disregard to the truth or falsity of these allegations.

117.   On information and belief, Crye chose to make its baseless allegations anyway in an intentional attempt to improperly financially benefit from the use of the Government's OCP for commercial products.

## COUNT I—DECLARATORY JUDGMENT OF NON-INFRINGEMENT OR UNENFORCEABILITY OF DEFENDANTS' COPYRIGHT
### (*Against both Defendants under 28 U.S.C. § 2201, 17 U.S.C. §§ 102, 106*)

118.   Propper repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

22

119. Defendants own the VA 1-942-951 Copyright Registration for the MultiCam® camouflage pattern ("MultiCam® Pattern").

120. Propper denies that the Government's OCP is substantially similar to the MultiCam® Pattern.

121. Propper denies any allegation that it or the U.S. Government copied any protectable elements of the MultiCam® Pattern.

122. Propper further denies any allegation that the Government's OCP copied any protectable elements of the MultiCam® Pattern.

123. Propper further denies any allegation that the Government's OCP is a derivative work based on the MultiCam® Pattern.

124. Propper denies that it has infringed or is infringing the MultiCam® Pattern.

125. Additionally, Propper has been buying OCP fabric and manufacturing goods from this fabric many years. Defendants have known of Propper's use of OCP since at least February of 2015, when they sent the letter attached as Exhibit A. Therefore, any rights that Defendants have in the VA 1-942-951 Copyright Registration are unenforceable against Propper's use of the Government's OCP under the equitable doctrines of laches, implied license, equitable estoppel, copyright misuse, abandonment, or waiver.

126. Any such claim is also barred by collateral estoppel, because Defendants' rights regarding the OCP were already validly, finally, and necessarily decided in previous lawsuits.

127. An actual, immediate, and justiciable controversy between the parties exists over whether Propper is infringing or otherwise violating any copyrights Defendants might have in the MultiCam® Pattern.

128. Propper has been and will continue to be damaged by the persistent uncertainty

23

created by Defendants' unsubstantiated claims with respect to Propper's legitimate use of the Government's OCP.

129.    Accordingly, pursuant to the Federal Declaratory Judgment Act, 28 U.S.C.§§ 2201 *et seq.*, Propper requests that this Court declare that Propper's use of the OCP Pattern has not infringed Defendant's purported copyright or any rights purportedly owned by Defendant.

## COUNT II—Federal Unfair Competition
### (*Against Crye Precision LLC under 15 U.S.C. § 1125(a)*)

130.    Propper repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

131.    Crye has made several false or misleading statements to customers who have purchased or may purchase from Propper, including that Propper does not have authority or approval to use the Government's OCP.

132.    On information and belief, this conduct is willfully intended to dissuade customers from purchasing Propper's products and to instead purchase products from Crye or Defendants' licensees.

133.    Crye's false or misleading representations misrepresents the nature, characteristics, or qualities of Propper's goods, services or commercial activities and are also causing and likely to continue to cause confusion, mistake, and to deceive customers and potential customers as to the sponsorship, approval, or affiliation of Propper's products. Such conduct therefore constitutes unfair competition and false representation in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

134.    The above-described acts of Crye, if not enjoined by this Court, are likely to deceive members of the general public.

135.    The above-described acts of Crye have irreparably harmed and, if not enjoined, will

24

continue to irreparably harm the interest of the public in being free from false statements, confusion, mistake, and deception as to the Government's OCP used in Propper's products.

136. As a direct and proximate result of Crye's unlawful conduct, Propper has suffered and will continue to suffer injuries unless and until such activity is enjoined by this Court, including irreparable damage and inherently unquantifiable injury and harm to its business, reputation, and customer goodwill.

137. Propper's remedies at law are not adequate to compensate for all the injuries willfully inflicted by Crye.

138. Accordingly, Propper is entitled to entry of preliminary and permanent injunctive relief requiring Crye to cease its false and misleading representations and unfair competitive practices.

139. Propper is also entitled to recover its actual damages and/or an award of Crye's profits, costs and reasonable attorneys' fees under 15 U.S.C. §§ 1116 and 1117. Any such damages and/or profits awarded should be trebled pursuant to 15 U.S.C. § 1117(a).

## COUNT III—Unfair Competition
### (*Against Crye Precision LLC under Missouri Common Law*)

140. Propper repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

141. The above-described acts of Crye constitute common law unfair competition.

142. The above-described acts of Crye unfairly and wrongfully misrepresent Crye's and Propper's respective rights in the Government's OCP.

143. By reason of the above-described acts of Crye, Propper has suffered damage to its goodwill.

144. The above-described acts of Crye have irreparably harmed and, if not enjoined, will

25

continue to irreparably harm Propper.

145.   The above-described acts of Crye have irreparably harmed and, if not enjoined, will continue to irreparably harm the interest of the public in being free from false statements, confusion, mistake, and deception as to the Government's OCP used in Propper's products.

146.   By reason of Crye's acts, Propper's remedies at law are not adequate to compensate for the injuries inflicted by Crye. Accordingly, Propper is entitled to entry of preliminary and permanent injunctive relief, in addition to monetary relief in the form of disgorgement of Crye's profits and corrective advertising costs.

147.   Crye's wrongful conduct was willful and deliberate or recklessly indifferent to the rights of Propper, warranting the assessment of punitive damages.

### COUNT IV—Tortious Interference with Contract
#### (*Against Crye Precision LLC under Missouri and New York Common Law*)

148.   Propper repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

149.   At all relevant times to this lawsuit, Propper has had binding and enforceable agreements with its customers.

150.   Crye has been aware of Propper's contracts with its customers, including with Kel-Lac Uniforms, Inc., R&S Army Navy Store; Mil-Bar Plastics, Inc; OpticsPlanet, Inc., Springs Tactical Gear, Inc. (d/b/a Venture Surplus), Commando Military Supply, Full Metal Jacket, LLC, and Bradley's Military Surplus.

151.   Crye has engaged in concerted efforts to induce, encourage, and facilitate the breach of these and other customers' obligations under their agreements.

152.   For example, in March of 2026, Crye sent letters to dozens of Propper's customers, including Kel-Lac Uniforms, Inc., R&S Army Navy Store; Mil-Bar Plastics, Inc; OpticsPlanet,

26

Inc., Springs Tactical Gear, Inc. (d/b/a Venture Surplus), Commando Military Supply, Full Metal Jacket, LLC, and Bradley's Military Surplus claiming that Propper was infringing its copyrighted MultiCam® Pattern and demanding that the customer either cease buying and selling from Propper or begin paying a royalty to Crye for these products.

153.    As a result, Propper's customers have reduced or ceased their orders of OCP products from Propper. For example, Bradley's Military Surplus informed Propper it has pulled all OCP from its shelves and online store and asked to hold any OCP backorders.

154.    Crye's intentional interference caused or was a significant factor in causing Propper's customers to breach their agreements with Propper.

155.    Crye's conduct described above was and is unjustified and wrongful in nature, in that Crye knows or reasonably should know that its copyright registration cannot be used to challenge the use of the Government's OCP used by Propper.

156.    Crye's conduct has directly and proximately caused significant damages to Propper in the form of, among other things, significant lost profits from customers wrongfully diverted from Propper and the loss of the benefit of the bargains it struck with its customers when it entered into these customer agreements.

157.    Crye's actions have been intentional and outrageous, and with reckless disregard to the rights of Propper, warranting an award of punitive damages.

### COUNT V—Tortious Interference with Business Expectancies
### (*Against Crye Precision LLC under Missouri and New York Common Law*)

158.    Propper repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

159.    At all relevant times to this lawsuit, Propper has had binding and enforceable agreements with its customers and had reasonable expectations of continuing these relationships

27

with its customers.

160. Crye has been aware of Propper's contracts with its customers and with Propper's expectancy of ongoing purchase orders, including with Kel-Lac Uniforms, Inc., R&S Army Navy Store; Mil-Bar Plastics, Inc; OpticsPlanet, Inc., Springs Tactical Gear, Inc. (d/b/a Venture Surplus), Commando Military Supply, Full Metal Jacket, LLC, and Bradley's Military Surplus.

161. Crye has engaged in concerted efforts to intentionally and unjustifiably divert business opportunities away from Propper, interfere with Propper's relationships with its customers, and directly and/or indirectly solicit these customers to move their business from Propper (or pay Crye a licensing fee).

162. For example, in March of 2026, Crye sent letters to dozens of Propper's customers, including Kel-Lac Uniforms, Inc., R&S Army Navy Store; Mil-Bar Plastics, Inc; OpticsPlanet, Inc., Springs Tactical Gear, Inc. (d/b/a Venture Surplus), Commando Military Supply, Full Metal Jacket, LLC, and Bradley's Military Surplus claiming that Propper was infringing its copyrighted MultiCam® Pattern and demanding that the customer either cease buying and selling from Propper or begin paying a royalty to Crye for these products.

163. As a result, Propper's customers have reduced or ceased their orders of OCP products from Propper. For example, Bradley's Military Surplus informed Propper it has pulled all OCP from its shelves and online store and asked to hold any OCP backorders.

164. Crye's intentional interference caused or was a significant factor in preventing Propper's legitimate business expectancy from ripening.

165. Crye's conduct described above was and is unjustified and wrongful in nature, in that Crye knows or reasonably should know that its copyright registration cannot be used to challenge the use of the Government's OCP by Propper.

28

166.    Crye's conduct has directly and proximately caused significant damages to Propper in the form of, among other things, lost profits from customers wrongfully diverted from Propper.

167.    Crye's actions have been intentional and outrageous, and with reckless disregard to the rights of Propper, warranting an award of punitive damages.

**COUNT VI--Tort of Injurious Falsehood**
**(*Against Crye Precision LLC under Missouri and New York Common Law*)**

168.    Propper repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

169.    In or around March 2026, Crye published false statements to Propper's customers.

170.    Specifically, between March 20 and March 31, 2026, Crye sent letters to dozens of Propper's customers, including Kel-Lac Uniforms, Inc., R&S Army Navy Store; Mil-Bar Plastics, Inc; OpticsPlanet, Inc., Springs Tactical Gear, Inc. (d/b/a Venture Surplus), Commando Military Supply, Full Metal Jacket, LLC, and Bradley's Military Surplus claiming that the Government's OCP used by Propper is derivative of or otherwise infringes the MultiCam® Pattern.

171.    Crye sent these letters despite knowing that this statement is false, or with reckless disregard of its truth or falsity.

172.    Crye sent these letters intending for this statement to harm Propper's pecuniary interests in the form of lost sales from customers in order to pressure Propper into paying royalties to Crye for using the Government's OCP.

173.    Alternatively, Crye sent these letters recognizing or reasonably should have recognized that the letters were likely to harm Propper's pecuniary interests.

174.    Crye's conduct has directly and proximately caused specific damages to Propper in the form of lost profits from customers to whom Crye directly made these false statements.  These damages have begun to accrue and are still ongoing, but will be specifically ascertainable for each

29

customer.

175.   Crye's actions have been intentional and outrageous, and with reckless disregard to the rights of Propper, warranting an award of punitive damages.

### COUNT VII—Prima Facie Tort (in the Alternative)
**(*Against Crye Precision LLC under Missouri and New York Common Law*)**

176.   Propper repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

177.   If it is determined that the above-described conduct is lawful, such activity would then constitute intentional and lawful conduct by Crye, and the circumstances would not come within any established tort cause of action.

178.   Such conduct was intentionally undertaken solely for the purpose to injure Propper by harming its reputation and business interests.

179.   Propper has in fact been injured by such conduct, in the ways specified above.

180.   There is no justification for Crye's actions, as Crye has no valid business interest in harming Propper.  At most, a patently insufficient justification exists for such actions.

181.   Crye's conduct has been outrageous, and demonstrates evil motive or reckless indifference to the rights of Propper, entitling Propper to punitive damages.

182.   If Crye's wrongful conduct is not enjoined, Propper will continue to suffer irreparable harm for which there is no adequate remedy at law, including but not limited to unjustified loss of customers, present and future economic loss, and reputational harm.

### COUNT VIII—Deceptive and Unfair Trade Practices
**(*Against Crye Precision LLC under New York General Business Law § 349(h)*)**

183.   Propper repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

30

184. The above-described acts of Crye constitute unfair methods of competition, and/or unconscionable, deceptive, or unfair acts or practices in violation of the laws of the State of New York, including New York General Business Law ("NYGBL"), section 349, et seq.

185. New York law is designed to prevent "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state[.]" NYGBL § 349(a).

186. The above-described acts of Crye were made in the conduct of Crye's business, trade, or commerce.

187. The above-described acts of Crye consist of consumer-oriented conduct affecting the public interest of New York and originating from Crye in New York.

188. The above-described acts of Crye are deceptive in that they wrongfully misrepresent Propper to its customers in a manner likely to deceive the public and mislead reasonable consumers.

189. The above-described acts of Crye are also abusive in that they take unreasonable advantage of customers by threatening unfounded legal action, when those customers are likely to or in fact reasonably rely on those threats to cease doing business with Propper in order to avoid Crye's legal action.

190. The above-described acts of Crye have irreparably harmed and, if not enjoined, will continue to irreparably harm Propper and its customers and prospective customers.

191. The above-described acts of Crye have irreparably harmed and, if not enjoined, will continue to irreparably harm the interest of the public in being free from false statements, confusion, mistake, and deception as to the Government's OCP used in Propper's products.

192. By reason of the above-described acts of Crye, Propper has suffered damage to the

31

goodwill associated with its trademark.

193.    Crye engaged in the above-described acts in willful and knowing violation of NYGBL § 349(a).

194.    Crye has unfairly profited from the actions alleged.

195.    By reason of Crye's acts, Propper's remedy at law is not adequate to compensate for the injuries inflicted by Crye. Accordingly, the Court should enter preliminary and permanent injunctive relief, in addition to ordering monetary relief in the form of Propper's actual damages, including corrective advertising costs; treble damages; and attorneys' fees as permitted by NYGBL § 349(h).

**PRAYER FOR RELIEF**

WHEREFORE, Propper prays the Court enter judgment in its favor and award Propper relief as follows:

1.    An order declaring that Propper's use of the Government's OCP does not infringe any purported copyright or other intellectual property rights held by Defendants, and that Defendants are without right or authority to object to Propper's use of the Government's OCP on the basis of alleged copyright infringement or any other legal right under federal or state law.

2.    An order declaring that Crye has violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); has engaged in deceptive and abusive acts and practices under Section 349 of the New York General Business Law; and have engaged in unfair competition in violation of the common law of the State of Missouri.

3.    A preliminary and permanent injunction enjoining and restraining Crye, its agents, affiliates, attorneys, employees, and all persons in active concert or participation with Crye from

interfering in any manner with Propper's use of the Government's OCP in relation to Propper's products.

4.      A preliminary and permanent injunction enjoining and restraining Crye, its agents, affiliates, attorneys, employees, and all other persons in active concert or participation with Crye, from any and all further interference with Propper's existing and prospective business relationships and expectancies as they relate to the Government's OCP.

5.      An award to Propper of all damages caused by the acts forming the basis of this Complaint.

6.      An award to Propper of all amounts, including profits, received by Crye as a direct and proximate result of Crye's unlawful conduct, including the trebling of such damages or profits pursuant to 15 U.S.C. § 1117, NYGBL § 349, and as otherwise provided by law.

7.      An award to Propper of the costs of this action and Propper's reasonable attorneys' fees incurred in connection with this action pursuant to 15 U.S.C. § 1117, NYGBL § 349, and as otherwise provided by law.

8.      An award to Propper of exemplary and punitive damages, based on Crye's willfulness and/or reckless acts identified herein.

9.      An award to Propper of prejudgment interest.

10.     An award to Propper of post-judgment interest.

11.     Such other and further relief to which Propper may be entitled.

### Demand for Jury Trial

Propper respectfully demands a jury trial on all claims and issues so triable.

Dated: April 27, 2026

*/s/ Marc Vander Tuig*
Marc W. Vander Tuig (52032MO)
Richard L. Brophy (59731MO)
Angela B. Kennedy (69167MO)
7700 Forsyth Blvd., Suite 1800
St. Louis, MO 63105
(314) 621-5070
mvandertuig@atllp.com
rbrophy@atllp.com
akennedy@atllp.com

*Attorneys for Plaintiff Propper International Sales, Inc.*

34